**TIDEWATER MANAGEMENT
SERVICES, INC.,**

v.

**The UNITED STATES.**

**No. 103–74.**

United States Court of Claims.

March 22, 1978.

Monroe E. Freeman, Jr., Washington, D. C., for plaintiff. F. Trowbridge vom Baur, Washington, D. C., attorney of record.

Anthony Thompson, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock. Susan M. Linden, Washington, D. C., of counsel, for the defendant.

Before COWEN, Senior Judge, DAVIS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge David Schwartz, filed September 13, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed September 13, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

affirms and adopts the decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

SCHWARTZ, *Trial Judge:* Plaintiff, an unsuccessful bidder on a contract awarded by the U.S. Navy, seeks damages in the amount of $1,664, consisting of its bid preparation costs, occasioned by the Government's alleged breach of its obligation to consider plaintiff's reply to a solicitation of bids with fairness and honesty and in compliance with applicable statutes and regulations and the terms of the solicitation. In an unbroken line of cases, this court has recognized its jurisdiction of an action such as this one based on an implied contract which obligates the Government to deal lawfully and in good faith with those who respond to its requests for bids or proposals. See *McCarty Corp. v. United States,* 499 F.2d 633, 204 Ct.Cl. 768 (1974); *Robert F. Simmons & Assocs. v. United States,* 360 F.2d 962, 175 Ct.Cl. 510 (1966); *Heyer Products Co. v. United States,* 140 F.Supp. 409, 135 Ct.Cl. 63 (1956).

In order to recover, a disappointed bidder such as the plaintiff must prove that the Government acted in an arbitrary or capricious manner in awarding the contract to another. *Keco Industries (I) v. United States,* 428 F.2d 1233, 1238, 192 Ct.Cl. 773, 782 (1970); *Excavation Construction Inc. v. United States,* 494 F.2d 1289, 1290, 204 Ct.Cl. 299, 302 (1974). As was said in *Keco Industries (I), supra,* and repeated thereafter, "the standard of proof to be applied in cases where arbitrary and capricious action is charged should be a high one." 428 F.2d at 1240, 192 Ct.Cl. at 784 (1970). *See also Continental Business Enterprises, Inc. v. United States,* 452 F.2d 1016, 1021, 196 Ct.Cl. 627, 637 (1971); *Excavation Construction, Inc. v. United States, supra,* 494 F.2d at 1290, 204 Ct.Cl. at 302.

Arbitrary and capricious action on the part of the Government may be shown by proof that there existed no reasonable basis for the award of the contract to another. *Continental Business Enterprises, Inc. v. United States, supra,* 452 F.2d at 1021, 196 Ct.Cl. at 637–38; *Keco Industries (II) v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566, 574 (1974). Subjective bad faith on the part of the procuring officials is such proof. *Heyer Products Co. v. United States, supra; Keco Industries (II) v. United States, supra.* Proof that the procuring officials violated "pertinent statutes or regulations can, but need not necessarily, be a ground for recovery." *Keco Industries (II) v. United States, supra,* 492 F.2d at 1204, 203 Ct.Cl. at 574.

Plaintiff has disavowed any contention that Government officials acted with subjective bad faith. Plaintiff does contend that there was no reasonable basis for the award to the successful bidder and that a relaxation of the requirements of the Request for Proposals (RFP) resulted in a violation of the law requiring maximum competition and a regulation requiring formal amendment of Government solicitations in certain situations. The same facts are claimed to support both contentions.

I. The RFP, the Proposals, the Negotiations and the Award

A. *The RFP for Mess Attendant Services at Treasure Island.* Among the contracts negotiated by installations such as the Naval Regional Procurement Office at Oakland, California ("Oakland") are those for mess attendant services. These contracts require the provision of laborers for food preparation and serving, dishwashing and cleanup in Navy mess halls. The quantity of work to be done at any time depends on the meal hour and the number of meals served, and thus varies during the day and on the different days of the week or month. Sundays, for example, find fewer patrons in the mess halls. An important aspect of successful management of mess attendant contracts, therefore, is the proper scheduling and movement of the regularly fluctuating number of workers needed. Profit on the contract is made by having the smallest number of people on the payroll at a given time of the day while still doing the job sufficiently well to satisfy the Navy.

**68**

· To ensure that a successful bidder understands this aspect of mess attendant work, the RFPs for such contracts require the aspiring bidder to complete charts which set out the number of workers assigned to each task in the mess hall during each half-hour of the working day. Called "manning charts," they permit a detailed analysis of the bidders' understanding of the intricacies of mess attendant contracting, the variety of jobs required to be performed and the importance of proper scheduling and assignments.

The RFP which is the subject of this case, distributed by Oakland on March 30, 1973, invited proposals for mess attendant services for the year ending June 30, 1974, at the U.S. Naval Station at Treasure Island, California. Offerors were instructed in section B3 of the RFP to submit two manning charts indicating their staffing levels in each half-hour of a representative weekday and a representative weekend day/holiday.[1] The manning charts are the factual center of the plaintiff's case against the award made, and their function must be explained in some detail.

Two charts, modeled after samples attached to the RFP, were to be filled out, one for a representative weekday, and one for the representative weekend day/holiday. The charts divided the day into half-hour segments from 0430 hours (4:30 a. m.) to 2000 hours (8:00 p. m.), and for each half-hour segment listed the jobs to be performed, such as dishwashing, serving line and cleanup. When completed by the bidders, the charts would show the number of workers the contractor intended to employ in each type of job during each half-hour segment of the representative working days and thereby permit judgment on his knowledge and ability to give satisfactory service. This was the stated purpose of the charts.[2]

In section D1(a),[3] the RFP gave a Government estimate of the number of hours of work needed for satisfactory performance on each of the two types of days —339 on a representative weekday and 235 on a representative weekend day/holiday, or a total of 111,983 hours in a year divided into 252 weekdays and 113 weekend days/holidays (252 × 339 = 85,428; 113 × 235 = 26,555; 85,428 + 26,555 = 111,983). Estimates by an offeror of less than 106,384 hours, 95 percent of the Government's estimate of 111,983, would have to be substantiated with a showing, called "documentation," that satisfactory service would be provided.

A paragraph entitled "Staffing Levels" in section J[4] of the RFP also concerned the

1. *"B3 REQUIREMENT FOR SUBMISSION OF MANNING CHARTS*

"(a) All offerors are required to submit manning charts with their proposals, in the format of Attachment E, showing the number of personnel proposed in each space each half hour of a representative weekday and of a representative weekend day/holiday."

2. "The manning charts are required in order to foster evaluation of:

(i) the offeror's understanding of Navy food operations in general and of the specific services required; and

(ii) the soundness and acceptability of the offeror's approach to performance of the services required." § B3(b), RFP.

3. "The manning levels reflected in the offeror's manning charts must be sufficient to perform the required services. For the purpose of evaluating proposals and establishing a competitive range for the conduct of negotiations, the Government estimates that satisfactory performance will require total manning hours (including management/supervision) of approxi-

mately *339* on a representative weekday and approximately *235* on a representative weekend day/holiday. Submission of manning charts whose total hours fall more than 5% below these estimates may result in rejection of the offer without further negotiations *unless* the offeror clearly substantiates the manning difference with specific documentation demonstrating that the offeror can perform the required services satisfactorily with such fewer hours."

4. "The staffing levels entered by the Contractor on the Manning Charts (Attachment E) shall become an integral part of the contract, and the Contracting Officer may require that this staffing level be fulfilled should performance of this contract fall below acceptable standards. The Contractor may be required to make monetary adjustments for any manhours less than those specified, should the Contracting Officer determine that a less than satisfactory level of performance is caused by personnel staffing below that set forth in Attachment E, Manning Charts. Notwithstanding the foregoing, the

uses of the manning charts: while they were an integral part of the contract and the devotion to the work of the hours indicated could be demanded by the Navy, satisfactory service was required without regard to the manning levels indicated in the charts.

The total dollar price offered by a bidder was required, in section D1(b)(2),[5] to "support" the annual hours in the manning charts, computed on the assumed basis of 252 weekdays and 113 weekend or holiday/days per annum. That is, the price divided by the hours, called the "dollar/hour ratio," had to be sufficient to show that the hours were realistic—that the contractor would be able to pay for the labor he was undertaking to provide. The contractor's bid price had to be sufficient to cover the costs of wages, fringe benefits and other employee-related expenses for the contract year. Otherwise hours might be inflated, with no intention or ability to defray their costs, in order to obtain a more favorable consideration of the offer.[6]

B. *Initial Bids.* Tidewater Management Services, Inc., the plaintiff, and Integrity Management International, Inc., the ultimately successful bidder, were among those firms which received an RFP. Plaintiff had been engaged in the business of performing mess attendant contracts for the Armed Forces since 1970, and had performed a number of such contracts for the Navy.

Thirteen bids were submitted initially. Plaintiff's net bid price was $495,488; its proposed annual hours were 94,950, less than the 106,384 hours which were 95 percent of the Government's estimate. As documentation in justification of the less than 95-percent-of-estimate hours, plaintiff stated that its West Coast manager, Mr. Hughes, had been engaged in food service work in the Navy for more than 20 years, and another supervisory employee had operated the same or comparable Navy mess halls in prior years, and that these men believed the 94,950 manhour estimate adequate. Plaintiff's dollar/hour ratio was sufficient to cover its basic labor expenses.

Integrity's net bid price was lowest, at $383,519.07. Its proposed annual hours were 107,603, greater than the 106,384 95-percent-of-estimate. The dollar/hour ratio of Integrity's offer was not sufficient to cover its basic labor expenses.

The price bid and the hours proposed by each bidder were as follows:

| Offeror | Net Evaluated Price | Annual Hours Proposed |
|---|---|---|
| 1. Integrity Management Int'l, Inc., the ultimately successful bidder | $383,519 | 107,603 |
| 2. ABC Management | 437,218 | 103,162 |
| 3. Quality Maintenance | 442,603 | 102,837 |
| 4. Space Services of Georgia | 444,570 | 106,343 |
| 5. Jet Services, Inc. | 459,900 | 107,699 |
| 6. American Maintenance & Management Services, Inc. | 460,845 | 106,621.5 |
| 7. Holloway Enterprises, Inc. | 476,028 | 106,621 |
| 8. Checker Services Division | 476,993 | 110,288 |
| 9. Technical Services Enterprises, Inc. | 489,668 | 106,525.5 |
| 10. Kleen-Rite Janitorial Services | 490,552 | 103,757.5 |
| 11. Tidewater Management, Inc., the plaintiff | 495,488 | 94,950 |

---

Contractor is responsible in any event for supplying sufficient personnel to perform the contract satisfactorily."

5. Section D1(b)(2) provided:

"[T]he hours shown in the manning charts must be supported by the price offered when compared as follows. The total hours reflected in the manning charts for the contract period (i. e., based on a contract year containing 252 weekdays and 113 weekend days/holidays) will be divided into the total offered price (less any evaluated prompt payment discount) to assure that this dollar/hour ratio is at least sufficient to cover the following basic labor expenses:

(i) the basic wage rate;

(ii) if applicable, fringe benefits, (health and welfare, vacation, and holidays); and

(iii) other employee-related expenses * * ".

6. A Note to Offeror in section D1 advised:

"The purpose of the above price-to-hours evaluation is to assure:

(i) that manning charts submitted are not unrealistically inflated in hopes of securing a more favorable proposal evaluation; and

(ii) that award is not made at a price so low in relation to basic payroll and related expenses established by law as to jeopardize satisfactory performance."

| 12. | PJK Food Service | 514,815 | 111,983 |
| 13. | M C & E Service and Support Co., Inc. | 524,656 | 109,211 |

### C. Evaluation of the Initial Bids.

The offers came for evaluation to Mrs. Emma Melton, the Navy's negotiator for the contract, who proceeded to evaluate each offeror's proposal with the use of the manning charts. She reviewed all of the charts with Lt. Robert Cotton, Food Service Officer at Treasure Island, to assure herself of the offeror's understanding of the Navy's requirements and the soundness of the bidders' management techniques.

Lt. Cotton also reviewed the initial proposals, including those that proposed less than 95 percent of the Government manhour estimate; he acted as technical adviser to Mrs. Melton during her evaluation of the proposals. On comparing the functional analyses and the different management techniques of the bidders, he saw nothing exceptional in the disparity among the bids or between the bids and the Government's estimate. Such differences, he testified, were reasonably to be expected in manhour estimates that spanned a year's time. He did not feel that any of the differences were unreasonable.

Mrs. Melton thereupon prepared a Pre-Negotiation Business Clearance Memorandum for the Contract Review Board at the Oakland Procurement Office, in which she recommended that the offerors be narrowed down to a competitive range. The Board, however, directed her to conduct negotiations with all 13 offerors.

Accordingly, she wired all 13 offerors on May 30, 1973, that they were in the competitive range and that a Government negotiator would contact them beginning the next day concerning their proposals. They were also told that confirmations and revisions of offers would be accepted until June 6, 1973 at 3:00 p. m., the deadline for what is known as the "best and final" offer. It seems that bidders in negotiated contracts, whether because they are fearful of leaks or otherwise, sometimes "bid high" at first and reserve their best and lowest offer for the final bid, after negotiations.

### D. The Negotiations for the Final Bids.

Beginning the next day, May 31, 1973, Mrs. Melton contacted the 13 original offerors. Working from a list of factors important in the evaluation of the offers, she questioned the bidders regarding those factors about which she felt she needed more information. When she called Mr. McLaughlin, plaintiff's president and chief executive since 1968, she told him that plaintiff's bid was in the competitive range and asked him either to confirm or to revise its price. In discussing the fact that his manhour proposal was less than 95 percent of the Government estimate, she told him that the Government estimate was realistic and that it was the judgment of the Food Service Officer that satisfactory performance could not be assured with a lower staffing level. Also, she said that she did not consider the documentation submitted to be enough justification for the less-than-95-percent proposal, in that all it told her was that plaintiff had superior management. She did not say that plaintiff should submit more documentation; such a further statement, in her view, would have been improper.

A second meeting with plaintiff's representatives took place on June 5, 1973, the day before the deadline for final offers. Mr. McLaughlin, who was accompanied by Mr. Hughes, reiterated his opinion that the contract could be performed with less than 95 percent of the Government's estimated manhours. He stated that his opinion was based on the experience of Mr. Hughes and another supervisor, Mr. Moreno, in previously operating the Treasure Island mess. Mrs. Melton replied that there had been changes in the requirements of the Treasure Island mess facilities since Mr. Hughes had been there. Reiterating her earlier statements, she said that Mr. McLaughlin "was short and was quoting below the 95 percent level that we had indicated and that his original offer had been low—below the 95 percent level."

In neither conversation did Mrs. Melton say, or give plaintiff's representatives to

understand, that an offer with a manning level of less than 95 percent of the Government's estimate would not be accepted. In both conversations, however, Mr. McLaughlin seems to have believed that she said that adherence to the 95 percent level was mandatory.

At the conclusion of their discussion, Mr. McLaughlin handed Mrs. Melton plaintiff's best and final offer. Plaintiff bid $453,298, about $42,000 less than its initial bid. Its two manning charts showed an annual level of 108,029 hours, 1,645 in excess of 95 percent of the Government's estimate. The dollar/hour ratio was sufficient to cover labor costs.

E. *The Final Bids.* The 13 final offers, submitted by the following day, ranged from Integrity's low of $379,366 with an annual manhour total of 94,266, to a high of $490,552 with a manhour total of 103,757.5.

The price bid and the hours proposed by each bidder were as follows:

| | Offeror | Net Evaluated Price | Annual Hours Proposed |
|---|---|---|---|
| 1. | Integrity Management Int'l, Inc. | $379,366 | 94,266 |
| 2. | ABC Management | 432,841 | 103,162 |
| 3. | Quality Maintenance | 440,694 | 104,292 |
| 4. | M C & E Service and Support | 442,262 | 109,211 |
| 5. | Space Services of Georgia | 444,570 | 106,343 |
| 6. | Tidewater Management, Inc. | 453,298 | 108,029 |
| 7. | PJK Food Service | 459,404 | 111,983 |
| 8. | Jet Services, Inc. | 459,900 | 107,699 |
| 9. | American Maintenance & Management Services, Inc. | 460,845 | 106,621.5 |
| 10. | Checker Services Division | 472,223 | 110,288 |
| 11. | Holloway Enterprises, Inc. | 473,647 | 106,621 |
| 12. | Technical Services Enterprises, Inc. | 489,668 | 106,525.5 |
| 13. | Kleen-Rite Janitorial Services, Inc. | 490,552 | 103,757.5 |

Integrity's best and final offer proposed to do the work with 94,266 hours, which was both the lowest of the annual hours proposed in all 13 final bids and a total of manhours less than the 95 percent of the Government's annual estimate. The offer consisted of three documents, the two required manning charts and a letter.

The manning charts were those accompanying the RFP—one for a representative weekday and one for a representative weekend or holiday day. They showed 322 manhours per day on the weekday and 223 manhours per day on the weekend day, numbers which would total 106,343 hours on the assumed annual division of the year into 252 weekdays and 113 weekend days or holidays. Had these been the hours actually proposed, the dollar/hour ratio was such that the bid price would not have been sufficient to support labor costs. But these were not the hours which Integrity believed were necessary and with which it expected to provide satisfactory service.[7] The hours bid were actually 94,266 and the two manning charts gave only the hours appropriate to the two types of days represented by the charts and not the five additional types of days which on Integrity's analysis were to be found in a year.

The accompanying letter, intended as a justification and explanation of the hours to a lesser total than 95 percent of the Government's estimate, explained that in basing its bid on 94,266 annual hours, Integrity had analyzed the contract year very differently from the Government breakdown into 252 weekdays and 113 weekend days or holidays. Integrity's analysis showed that there were no less than seven types of days in the mess hall year. Several kinds of days, Integrity explained, did not require the amount of labor quoted in the charts for either a representative weekday or a representative weekend day. Integrity saw special manning needs on Fridays, for which fewer hours were needed than for a representative weekend day; on holidays, which required fewer hours of labor than a representative weekend day; paydays, for which fewer hours were needed than for a representative weekday but more than for a representative weekend day; on "premium" days, requiring fewer days than either a representative weekday or a representative weekend day, and on Saturdays.

---

**7.** The conclusion as to hours: "[m]athematically, then, our manhour estimate for the entire year is 94,266, as budgeted above, and not 106,343 as might be indicated if one multiplied our representative days of 322 × 252 and 223 × 113, respectively."

By basing its proposal on different hours for each of these several types of days, as well as for the two Government-suggested representative days, Integrity had been able to keep the total hours at 94,266, a number whose costs were supported by its bid price. These hours were both substantially lower than 95 percent of the Government's estimate and lower than any of the other bidders. The letter concluded with an assurance that Integrity would supply the number of hours indicated in its manning charts or whatever number of manhours would be necessary for satisfactory performance:

> Regardless of the aforementioned budgeting and planning we do recognize our responsibility to provide sufficient manhours *everyday* to accomplish the goals and desires of the specifications. Therefore, please be assured that we shall provide 322 manhours, or more, if necessary, on any day where successful performance demands.

Finally, Integrity asked that the Government keep the bidding technique in strictest secrecy. The testimony at the trial was that Integrity's method of analysis of the contract year was original with Integrity and was entirely novel. It has since become the standard basis for RFPs for mess attendant contracts. RFPs for mess attendant contracts issued after the award of the instant Treasure Island contract provided that offerors could submit manning charts for as many different representative days as they chose, with a minimum of two.

F. *The Award to Integrity.* On receipt of the 13 best and final offers, Mrs. Melton incorporated the relevant data into a Post-Negotiation Business Clearance Memorandum. In evaluating Integrity's bid, Mrs. Melton used the actual productive hours of 94,266 which Integrity had proposed, because those were the hours that the bidder was planning to use to do the job. Her assessment of the bids and proposals led her to recommend that Integrity's offer be accepted. The recommendation was adopted and the contract was awarded to Integrity.

II. The Alleged Unreasonableness of the Award to Integrity

Plaintiff makes three contentions in support of its conclusion that the award to Integrity was without reasonable basis: (1) Integrity's failure to submit a manning chart for each representative day actually used in computing its bid provided too little information on which to base a reasonable decision to contract, (2) Integrity violated a portion of section J of the RFP, entitled Staffing Levels, note 4, *supra,* which plaintiff reads to require a manning chart for every representative day used in bidding the contract, and (3) that there would have been no reasonable basis for any determination by the contracting officer that Integrity's "guarantee" of the levels on its two manning charts "made up" for the "omission" of the additional manning charts, which were missing on the premise of plaintiff's preceding contention (2).

1. There is no merit in the contention that the omission of a manning chart for each representative day used by Integrity in preparing its bid left the Government with too little information on which to make a reasonable decision in the matter. Manning charts, beyond the two required by the RFP, were not absolutes. The two charts called for by the RFP were useful as a means of evaluating the ability of the contractor to do the job—to determine whether the bidder understood the Government's requirements and the Navy food service program and had a sound management approach. In other words, they were used to assess the responsibility of the bidder. If the bidder were to show his responsibility by another method—show by any method that he could do the job in the 94,266 hours—the function of a manning chart would be served, and there would be no significance in the omission of a third, fourth, fifth, sixth and seventh chart for each of the 5 never-before-used representative days.

The charge thus becomes one that in the absence of four additional manning charts, the Government's negotiators lacked a reasonable basis on which to conclude that

Integrity was responsible and could adequately do the job which it undertook to do.

■ The applicable principles of law are clear. Procurement officers, especially those who procure by negotiation, are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government. Effective contracting demands broad discretion, for "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for." *Sperry Flight Systems Division v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329, 339 (1977). It is particularly understood that "the contracting officer will have very wide discretion in making [the] determination [of the bidder's responsibility]." *Keco Industries (II) v. United States, supra,* 492 F.2d at 1205, 203 Ct.Cl. at 576 (1974). And, again: "The statute and the applicable regulations confer broad discretion on the contracting officer in deciding who is a responsible bidder." *Warren Brothers Roads Co. v. United States,* 355 F.2d 612, 615, 173 Ct.Cl. 714, 720 (1965); see ASPR 1.902, 1.903, 1.905, 1.906, 32 C.F.R. § 1–902, 903, 904, 905, 906.[8]

■ On reviewing Integrity's letter in support of its proposal of less than 95 percent of the Government estimate, without more than the two required charts, Mrs. Melton was satisfied that Integrity had shown how it would achieve satisfactory service with the hours it contemplated, though they were substantially less than 95 percent of the Government's estimate. She was not without experience in these matters. She had worked in procurement for 10 of her 31 years in Government service and had handled the mess attendant contracts awarded by the Oakland procurement office for several years prior to this one. Her testimony, throughout, made a good impression.

She discussed Integrity's final offer with Lt. Cotton, the Food Service Officer, who was not at all surprised to find Integrity's estimate to be so much lower than the Government's. The Government's estimate, he said, is prepared by non-experts who want the contractor to give the most service possible, while the contractor makes a profit by paying the smallest permissible number of workers. He checked Integrity's proposal and found that it was historically true that there were variations in the numbers of meals served on the days cited by Integrity. His testimony was that while he could not precisely evaluate the adequacy of Integrity's daily estimate of hours, he did not find the totals abnormally low. He was satisfied that on historically "slow" days, there would be fewer patrons and correspondingly a need for fewer service personnel. Consequently he agreed with Mrs. Melton that Integrity could provide satisfactory service with the 94,266 hours it contemplated. Lt. Comdr. Sneiderman, the contracting officer who actually signed the award, also agreed. He was of the opinion

---

8. "1–902 General Policy. Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only. A responsible prospective contractor is one which meets the standards set forth in 1–903.1 and 1–903.2, and such special standards as may be prescribed in accordance with 1–903.3 and by overseas commanders. The award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional procurement or administrative costs. While it is important that Government purchases be made at the lowest price, this does not require an award to a supplier solely because he submits the lowest bid or offer. A prospective contractor must demonstrate affirmatively his responsibility, including, when necessary, that of his proposed subcontractors. The contracting officer shall make a determination of nonresponsibility if, after compliance with 1–905 and 1–906, the information thus obtained does not indicate clearly that the prospective contractor is responsible. Recent unsatisfactory performance, in either quality or timeliness of delivery, whether or not default proceedings were instituted, is an example of a problem which the contracting officer must consider and resolve as to its impact on the current procurement prior to making an affirmative determination of responsibility. Doubt as to productive capacity or financial strength which cannot be resolved affirmatively shall require a determination of nonresponsibility." ASPR 1.902 (1975).

that Integrity had for the first time in the bidding of mess attendant contracts taken the time to review what was really going on in the mess halls; that Integrity was "sharpening its pencil" and "was trying to use * * * knowledge of what was going on to present a competitive approach to the problem." Even Mr. McLaughlin, plaintiff's president, while he was of the opinion that Integrity's bid did not meet the conditions of the RFP ("It didn't match what the Government asked for"), said that Integrity had done a "reasonably" professional job of dividing the year into representative days; he agreed that its proposal made sense.

Mrs. Melton, Lt. Cotton and Lt. Comdr. Sneiderman unanimously considered the information received from Integrity to be sufficient data on which to base a reasonable decision to contract. There is no indication that they felt the need for more information; nor is there any objective evidence before the court to indicate that they were unreasonable or acted without basis in this decision. They cannot therefore be held to have abused their wide discretion in concluding that they had sufficient information on which to make the award to Integrity.

■ 2. The factual circumstance discussed above—the absence of a manning chart for each representative day used by Integrity to compute its bid—is relied on for plaintiff's further contention of a violation of section J of the RFP: section J, note 4 *supra,* contains an "express requirement * * * that specific staffing levels for each space/job and half-hour time period of each day be provided in the proposal for incorporation in the contract." Passing the question whether the award would be vitiated, or other bidders damaged, by the failure to comply with such a requirement as plaintiff finds in section J, the contention overstates the terms of section J. The portion of section J relied upon says only that "[t]he staffing levels entered by the Contractor on the Manning Charts (Attachment E) shall become an integral part of the contract." It does not say that a chart

must be submitted for each representative day used to compute a bid. The only requirement as to submission of charts in paragraph B3, note 1, *supra,* is that charts be submitted for the two indicated representative days, and this Integrity complied with.

■ 3. Plaintiff's final point against the reasonableness of the award to Integrity is that there would have been no reasonable basis for any determination by the contracting officer that Integrity's guarantee of the hours on its manning charts (or of any hours necessary to ensure satisfactory performance) "made up" for a lack of more than two manning charts.

Plaintiff has not alleged that such a determination was made, and there is no evidence of its making. Indeed, section J of the RFP, note 4, *supra,* itself enforced such a "guarantee." The contention is thus somewhat unrealistic. The absence of more than the two manning charts was not a culpable omission. And the so-called guarantee seems to have played no part in the award to Integrity.

In connection with a bid protest as to the Treasure Island procurement, Lt. Comdr. Sneiderman made an affidavit that the award was based on the fact that Integrity was the lowest bidder and had supplied sufficient documentation to assure the Government that it could perform the contract with less than 95 percent of the Government's manhour estimate. He added that Integrity's "guarantee," in its letter accompanying its final bid, of as many hours as would be necessary to do the job was not a meaningful statement in weighing the relative merits of its bid, for the RFP required the successful bidder to supply as many manhours as would be necessary to provide satisfactory performance. The testimony was that neither Lt. Comdr. Sneiderman nor Mrs. Melton considered this "guarantee" to be necessary or crucial to the award to Integrity.

III. Alleged Illegality of the Award

1. A first charge of illegality is that the Armed Services Procurement Act, 10 U.S.C.

§ 2304(g), was violated by a lack of reasonable ground for the award to Integrity. Among other things, the section provides that in negotiated procurements, proposals shall be solicited from the maximum number of qualified sources and that discussions shall be held with all responsible bidders in a competitive range.[9] Assuming that the statute is relevant here, the claim of no reasonable ground for the award has already been discussed and found to be without merit.

2. At one point in the course of this case, plaintiff may also have contended that competitive equality was compromised in that plaintiff was told that the Government would not accept any proposal based on hours less than 95 percent of the Government's estimate, and nevertheless such a proposal was in fact accepted. The contention has apparently been abandoned; it does not appear in the post-trial briefs. Were the contention made and valid, it would mean that plaintiff had been misadvised as to evaluation criteria and thus deprived of an opportunity to compete effectively. It is, however, found as a fact that Mrs. Melton did not misadvise plaintiff's president.

The conversation took place in a context in which the RFP expressly permitted proposals based on less than 95 percent of the Government's estimate of hours, on presentation of a sufficient justification for the lesser number of hours. Plaintiff at first submitted such an estimate of lesser hours, with a written justification consisting of no more than a statement that its managers were skilled and experienced. This the contracting officer found to be insufficient justification. She reiterated what was clear enough from the RFP—that the Food Service Officer doubted that satisfactory service could be provided with less than 95 percent of his estimate and that his estimate was realistic. This constituted a plain challenge to plaintiff's Mr. McLaughlin to produce a better justification or use the Government's estimate.

She did not tell him—and he did not testify that she did—that the Government would not accept proposals which fell below 95 percent of the Government estimate. Such a statement she would have thought highly improper, in the face of the permission in the RFP for such proposals, when justified. He was well-experienced and should have understood her. To the extent he did not, he was unreasonable. Mrs. Melton talked to all the bidders. Four of the 13 final bidders proposed hours numbering less than 106,384 hours, which was 95 percent of the Government's estimate—surely some confirmation of Mrs. Melton's testimony that she would not tell a bidder that offers of less than 95 percent would not be accepted. The variety of bids and the number proposing less than 95 percent of the Government's estimates is good evidence that the goal of maximum competition was not compromised.

In the final bidding, plaintiff, unable to improve on its justification—the experience of its supervisors—for a quotation of hours less than 95 percent of the estimate in the RFP, changed its bid, increasing its proposed hours from 94,950 to 108,029 and decreasing its price from $495,488 to $453,298. Integrity could and did find a justification, and it therefore lowered its estimate of

**9.** 10 U.S.C. § 2304(g) (1970) provides:

"In all negotiated procurements in excess of $2,500 in which rates or prices are not fixed by law or regulation and in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted, with all responsible offerors who submit proposals within a competitive range, price, and other factors considered: *Provided, however,* That the requirements of this subsection with respect to written or oral discussions need not be applied to procurements in implementation of authorized set-aside programs or to procurements where it can be clearly demonstrated from the existence of adequate competition or accurate prior cost experience with the product, that acceptance of an initial proposal without discussion would result in fair and reasonable prices and where the request for proposals notifies all offerors of the possibility that award may be made without discussion.

hours from 107,603 to 94,266 and lowered its price from $383,519 to $379,367. Having adequately justified the lower number of hours, and being lowest in price it got the award.

3. Next, plaintiff alleges relaxation of the requirements of the RFP, not communicated to all the bidders and not reflected in an amendment to the RFP, thus violating ASPR § 3.805–1(e), 32 C.F.R. § 3–805.1(e) (1972).[10] This is what Mr. McLaughlin meant by his statement that the bid did not comply with what the Government asked for in the RFP. Integrity's bid certainly did not comply with the assumptions of those who devised the RFP. The three Government officers involved agreed that Integrity's bid was their first experience with a mess attendant contract analysis which computed manhours on a basis other than two representative days. All three had assumed that proposals would be based on two representative days.

Their assumptions were of course not controlling on bidding technique. What was controlling was that the RFP in paragraph B3, note 1, supra, required only that charts for the two representative days be submitted. It did not forbid a bid on a proposal based on more than two representative days or, indeed, on more than two charts had a bidder desired to submit them.

The successful bidder obviously improved on the techniques that had previously been used in computing estimates of hours to support the bid price. The RFP did not contemplate new techniques, but neither did it bar them. When proposals in the best interests of a Government procurement do not violate the terms of the solicitation, they are not to be disregarded because they are innovative in a way not foreseen and not forbidden by the RFP.

The first specific in the claim of violation of regulations is an alleged relaxation of the definition of the components of the contract year. That is, the evaluation of Integrity's bid to permit it to be based on six types of days, a bid basis unknown to the plaintiff, deprived the plaintiff of the opportunity to compete equally. Plaintiff would make mandatory the RFP description of a contract year of so many weekdays and holidays, with an estimate of the needed hours in each. Sections D1(a) and D1(b), RFP, notes 3 and 5, supra. But these numbers of days per annum were used only to explain the basis of the Government's estimate of satisfactory annual hours and the concept of the dollar/hour ratio. They did not define or restrict the contract year or the bidder's own analysis of the hours it felt were needed for satisfactory service on all the days of the year, subject only to the condition of justification, if the bidder proposed hours fewer than 95 percent of the Government's estimate.

The second claimed relaxation is that of an alleged requirement for space/job staffing levels for all days of the contract year. This is a restatement of the claim, already disposed of, that each bidder was required to submit manning charts for every day of the contract year, or for every representative day used.

The third relaxation concerns the dollar/hour ratio requirement, which Integrity's bid is said to have violated in that the hours shown on Integrity's manning charts were not supported by the price bid.

Plaintiff would rewrite Integrity's justification so that the hours reflected on its two manning charts would be used to compute the dollar/hour ratio; the object, of course, is to demonstrate an unacceptable dollar/hour ratio. Were this done, Integrity's dollar/hour ratio would not support its bid price. But Integrity's bid was based on more representative days than the two types for which it submitted manning

10. "When, during negotiations, a substantial change occurs in the Government's requirements or a decision is reached to relax, increase or otherwise modify the scope of the work or statement of requirements, such change or modification shall be made in writing as an amendment to the request for proposal or request for quotations, and a copy shall be furnished to each prospective contractor * *." ASPR § 3.805–1(e), 32 C.F.R. § 3–805.1(e) (1972).

charts, and thus on different hours than those charts showed. Integrity explained that its actual intended hours, 94,266, were based on seven representative days of which only two were represented by its manning charts, and the 94,266 hours were in fact supported by the dollars bid.

Once the total proposal went beyond the two charts submitted, the two charts could not control the dollar/hour ratio. The ratio was merely a means for assuring that the bidder could understand the services required and could pay the labor costs with the amount being bid. Since the procurement officers were assured of this, the artificial and unintended dollar/hour ratio between the two charts and the bid price had no effect. With the days on the two charts enlarged by the additional representative days, the procurement officers were reasonably convinced of a satisfactory dollar/hour ratio. It is held, above, that this method was permissible; that it was not a violation of the RFP; and that the decision to award the contract to Integrity was not shown to have been arbitrary or unreasonable.

Plaintiff has failed to meet the burden of proof imposed on those who claim that Government procurement activity has been arbitrary and capricious. It has been unable to show either a lack of a reasonable basis for the award to another or a negotiation or award in violation of a statute, a regulation or the Request for Proposals. The underlying complaint is that the award was unfair because Integrity's proposal was innovative in ways not foreseen by the RFP and not employed by the other bidders. The Government was free to accept a proposal incorporating innovative techniques with resulting economy and advantage to the United States. The ultimate object of competition and procurement in the best interests of the Government was well served. The complaint is dismissed.

CONCLUSION OF LAW

Upon the trial judge's findings and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.