WACKENHUT INTERNATIONAL, INC., and Wackenhut de Guatemala, S.A., A Joint Venture, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Inter–Con Security Systems, Inc., Defendant–Intervenor.

No. 97–680C.

United States Court of Federal Claims.

Jan. 13, 1998.

---

Richard J. Webber and William W. Goodrich, Jr., Washington, DC, for Plaintiff.

Carol L. Wallack, with whom were Frank W. Hunger, Asst. Atty. Gen., and David M. Cohen, Director, Washington, DC, for Defendant. Dennis J. Gallagher, Department of State, of counsel.

Neil H. O'Donnell, San Francisco, CA, for Defendant–Intervenor.

## OPINION

ANDEWELT, Judge.

### I.

■ In this post-award bid protest action brought pursuant to 28 U.S.C. § 1491(b), plaintiff, a joint venture formed by Wackenhut International, Inc., and Wackenhut de Guatemala, S.A. (Wackenhut), seeks injunctive and declaratory relief setting aside the award of a contract by the United States Department of State (DOS) to Inter–Con Security Systems, Inc. (Inter–Con). The contract at issue covers the provision of security guard services at the United States Embassy in Guatemala City, Guatemala (the Embassy). Plaintiff contends that DOS made a series of errors in evaluating the competing proposals and that if DOS had not made these errors, DOS would have awarded plaintiff the contract. Pursuant to 28 U.S.C. § 1491(b)(4), this court reviews such allegations of error in the contract award process under the deferential standard set forth in 5 U.S.C. § 706. Section 706 provides that this court shall set aside the award of a contract

only if the agency's actions are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." To prevail in a protest to an award of a government contract, "a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). This action is before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, plaintiff's motion for summary judgment is denied and defendant's and defendant-intervenor's cross-motions are granted.

## II.

The contract solicitation established a point system for evaluating competing proposals. A maximum of 105 points was available—a total of 40 points for price, a total of 60 points for technical considerations, and an additional 5 points for qualifying for a "U.S. preference." The technical points were divided among the following categories: organization and management; inspection system; key personnel; training program; past performance and experience; experience in use and maintenance of property used in contract performance; and quality of transition plan. The additional five points were available to bidders who could be classified as "United States persons" or "qualified United States joint venture persons" and who otherwise qualified for a preference pursuant to 22 U.S.C. § 4864(c)(7).

DOS evaluated the technical merits of the competing proposals using a three-member Technical Evaluation Panel (TEP). Ultimately, DOS granted Inter–Con the maximum 105 points—a perfect score of 40 points for price and 60 points for technical considerations plus 5 preference points as a qualifying "United States person." Plaintiff received the second highest point total of 100.08 points, including 39.08 points for price, 56 points for technical considerations, and 5 preference points as a qualifying "United States joint venture person." After DOS awarded the contract to Inter–Con based on

these evaluations, plaintiff filed the instant action contesting the award.

## III.

Plaintiff contends that DOS erred in granting Inter–Con the 5–point preference as a qualifying "United States person" and that without these additional points, Inter–Con would have received a total of only 100 points compared to plaintiff's 100.08 points and hence, DOS presumably would have awarded plaintiff the contract.

The 5–point preference derives from 22 U.S.C. § 4864, which provides, in part:

(c) **Participation of United States contractors in legal guard contracts abroad**

With respect to local guard contracts for a Foreign Service building which exceed $250,000 and are entered into after February 16, 1990, the Secretary of State shall—

\* \* \* \* \* \*

(7) give preference to United States persons and qualified United States joint venture persons where such persons are price competitive to the non–United States persons bidding on the contract, are properly licensed by the host government, and are otherwise qualified to carry out all the terms of the contract.

(d) **Definitions—**

For the purposes of this section—

(1) the term "United States person" means a person which—

(a) is incorporated or legally organized under the laws of the United States, including the laws of any State, locality, or the District of Columbia;

(B) has its principal place of business in the United States;

(C) has been incorporated or legally organized in the United States for more than 2 years before the issuance date of the invitation for bids or request for proposals with respect to the contract under subsection (c) of this section;

(D) has performed within the United States or overseas security

services similar in complexity to the contract being bid;

(E) with respect to the contract under subsection (c) of this section, has achieved a total business volume equal to or greater than the value of the project being bid in 3 years of the 5–year period before the date specified in subparagraph (C);

(F)(i) employs United States citizens in at least 80 percent of its principal management positions in the United States; and

(ii) employs United States citizens in more than half of its permanent, full–time positions in the United States; and

(G) has the existing technical and financial resources in the United States to perform the contract;

(2) the term "qualified United States joint venture person" means a joint venture in which a United States person or persons owns at least 51 percent of the assets of the joint venture. . . .

DOS implemented the statutory mandate that preference be given to qualifying bidders by providing in the solicitation that bidders who qualify for the preference would receive five additional points in their total score.

Plaintiff does not dispute that Inter–Con satisfies the requirements in Section 4864(d)(1)(A)–(G) so as to fit within the definition of a "United States person." Instead, plaintiff's contention that Inter–Con did not properly qualify for the 5–point preference rests on the statement in Section 4864(c)(7) that the Secretary of State shall "give preference to United States persons . . . where such persons . . . are properly licensed by the host government." Plaintiff contends that Inter–Con did not qualify for a preference thereunder because Inter–Con was not and cannot be "properly licensed by the host government," i.e., Guatemala.

## IV.

### A.

The administrative record does not describe in detail the reasoning DOS employed

in determining that Inter–Con qualified for the 5–point preference. To provide the court with further explanation of DOS's decision-making process, defendant submitted two affidavits in support of its cross-motion for summary judgment. Defendant first presents the affidavit of Dennis J. Gallagher, DOS's Assistant Legal Advisor for Building and Acquisitions.[1] Gallagher helped design the 5–point preference system that DOS implemented to comply with the preference mandate in Section 4864, and Gallagher's office was responsible for evaluating the "Statements of Qualifications" presented by offerors who sought the 5–point preference and for submitting the results of these evaluations to DOS's Office of the Procurement Executive.

According to Gallagher, the requirement in Section 4864(c)(7) that a bidder seeking a preference be "properly licensed by the host government" consistently has been interpreted by DOS as not requiring that the bidder possess a license at the time of the award but rather only that the bidder comply with the conditions with respect to licensing that are specifically set forth in the solicitation. Gallagher explained DOS's interpretation of the licensing requirement as follows:

[DOS] has always treated [the "properly licensed" requirement in Section 4864(c)(7)] as a term of art used consistently with General Accounting Office precedent on licensing requirements. That is, [DOS] understands the requirement that an offeror be "properly licensed" in order to receive U.S. person preference to mean that the offeror must meet the licensing requirements of the solicitation. Where the solicitation contains a specific requirement that an identified license be obtained and evidence thereof presented to the Embassy prior to award, then an offeror is not "properly licensed" if it does not meet this condition. But if the solicitation does not require specific pre-award licenses, then whether the offeror has or can obtain the licensing it needs to perform the contract is considered to be part of the responsibili-

---

1. The court will address the second affidavit in a later discussion.

ty determination to be made in the exercise of business judgment by the contracting officer. . . .

[The Office of the Legal Advisor] and the Office of the Procurement Executive generally advise Embassies against establishing specific pre-award licensing requirements. Licensing of security guard contractors is frequently expensive, and it would be inconsistent with the intent of [Section 4864] to increase participation by U.S. contractors to erect such a barrier to competition. Moreover, [Section 4864(c)(5)] require[s][DOS] to "ensure that United States diplomatic and consular posts assist United States firms in obtaining local licenses and permits." Such diplomatic assistance is generally more effective after the awardee has been selected, when official support can be directly related to the security needs of the mission.

The instant solicitation does not require bidders to secure licenses pre-award, but rather anticipates that the Embassy will help the contract awardee secure the necessary licenses subsequent to contract award. Section H.7.6 of the solicitation provides as follows:

*Permits.* Without additional cost to the Government, the Contractor shall obtain all permits, licenses, and appointments required for the prosecution of work under this contract. The Contractor shall obtain these permits, licenses, and appointments in compliance with applicable host country laws. The Contractor shall provide evidence of possession or status of application for such permits, licenses, and appointments to the Contracting Officer with his proposal.

Failure to provide evidence of appropriate progress toward receipt of such permits so as to be fully licensed by date planned for commencement of contract performance may result in Contractor being found nonresponsible (not eligible for award) or result in contract termination if required documents are subsequently denied or withdrawn by the local authorities. Application, justification, fees, certification for any licensure required by the host govern-

ment are entirely the responsibility of the Contractor.

Once the contract is awarded, the embassy will assist the Contractor to obtain permits and licenses as necessary. All assistance must be requested by the Contractor in written form, submitted to the Contracting Officer.

Hence, under DOS's interpretation of the Section 4864(c)(7) requirement that a bidder seeking a preference be "properly licensed by the host government," it was sufficient that Inter–Con satisfied the licensing requirements set forth in the solicitation which obliged offerors, *inter alia,* to "provide evidence of possession or status of applications for [the] license[ ]." Under Section H.7.6 of the solicitation, failure to make appropriate progress toward receipt of a required license could result either in a determination of ineligibility to receive the award or, after the award has been granted, in contract termination.

### B.

The first issue the court will address is whether DOS's interpretation of Section 4864(c)(7) is viable. As explained above, this court may set aside DOS's award of the contract to Inter–Con only if the court finds the award to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. In determining whether a federal agency's interpretation of a statute is "in accordance with the law," where, as here, the agency is interpreting a statute that the agency has been charged with implementing, the court must allow the agency significant discretion. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *see also Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.").

■ Applying this deferential standard, this court will not disturb DOS's interpretation of the "properly licensed" requirement

in Section 4864(c)(7) as "a term of art used consistently with General Accounting Office precedent on licensing requirements." Section 4864 does not define the prerequisites for a firm to be considered "properly licensed" and does not specify that a bidder must secure a license prior to contract award in order to be eligible for a preference. Section 4864 clearly expresses Congress' intent that the preference therein not be interpreted to oblige DOS to grant a contract to an offeror who is not properly licensed by the host government. DOS's interpretation furthers this intent by requiring bidders to explain in their proposals the status of licensing and permitting DOS either to refuse an award on responsiveness grounds or to terminate a contract already awarded if it appears that the offeror or contractor will not obtain a license from the host government at some time before contract performance begins. DOS's approach is also consistent with Congress' general purpose in enacting Section 4864 of encouraging United States persons to bid on security contracts for guard services overseas. As suggested in Gallagher's affidavit, interpreting Section 4864 so as to require a bidder to complete or almost complete the process of securing a license prior to submitting its proposal potentially could raise significantly the cost of preparing an offer and thereby could discourage potential offerors who qualify as "United States persons" or "qualified United States joint venture persons" from bidding. For these reasons, the court will defer to DOS's interpretation of Section 4864(c)(7).

### V.

The next issue the court will address is whether DOS properly applied its interpretation of the requirements of Section 4864. Consistent with the solicitation requirements, Inter–Con included in its proposal the following statement as to the status of Inter–Con's efforts to secure the required license:

Inter–Con has retained the services of Juan Jose Samayoa V. in Guatemala City to process all the requirements needed to establish a branch office in Guatemala and to obtain the necessary licenses and permits to operate a private security company as well as the authorization to import security-related equipment. Based on consultations with the attorney, it has been determined that Inter–Con will have all the required licenses and permits to operate as a security company in Guatemala by February 1997. The business permit that allows Inter–Con to conduct business in Guatemala has already been obtained.

The Inter–Con Transition Team will closely monitor actions and progress on licenses and permits through frequent consultations with the attorneys, and this team will keep the [contracting officer] informed of the progress in its weekly status reports.

Inter–Con did not secure a license by February 1997 as predicted in its proposal or by the time DOS awarded the contract on August 1, 1997. Plaintiff contends that this delay should have alerted DOS as to a possible problem which DOS should have investigated. Had DOS performed such an investigation, plaintiff argues, DOS would have determined that Inter–Con could never be "properly licensed" by the Guatemalan government and hence would not qualify for the 5–point preference. To support this argument, plaintiff presents an affidavit by a practicing attorney in Guatemala which states that under Guatemalan law, in order for a firm to be licensed to provide security guard services in Guatemala, the firm must be incorporated in Guatemala and its managers, directors, and administrative personnel must be Guatemalan citizens. Because Inter–Con is not a Guatemalan company, plaintiff argues, Inter–Con never will secure the required license. Plaintiff argues that had DOS investigated this licensing issue, it would have realized that Inter–Con never could secure in its own name the required license. Plaintiff contends that for Inter–Con to have submitted a viable bid that qualified for the 5–point preference, Inter–Con would have had to have done what Wackenhut International, Inc., did—form a joint venture with a Guatemalan company and submit an offer as a "qualified United States joint venture person."

Certainly, DOS could have performed a study of Guatemalan law before issuing the contract or could have conducted a more

thorough inquiry into licensing when Inter–Con had not secured a license by the date predicted in its proposal or by the date of contract award. But by not doing so, DOS did not abuse its discretion. Engaging in such research efforts could have been costly to DOS and would not necessarily have yielded definitive results. Moreover, in the instant case, even an unambiguous interpretation of current Guatemalan law would not necessarily have yielded a final answer on the licensing issue. The passage of new laws or a waiver of an existing prohibition by an authorized Guatemalan official, for example, potentially could have changed an offeror's licensing prospects. It is at least possible that the Embassy could have secured from the Guatemalan government any necessary modification of the existing law if Inter–Con had requested the Embassy's assistance in securing a license pursuant to Section H.7.6 of the solicitation.

Cost and uncertain results are not the only factors weighing against DOS engaging in a study of foreign law. At the time of contract award, DOS was aware of certain facts that reasonably suggested that Inter–Con likely would secure a proper license. Inter–Con was a major provider of security guard services to United States embassies and had successfully secured licenses from host governments throughout the world. In addition, Inter–Con reasonably should have been aware that it could not perform the contract without securing the required license and hence DOS reasonably could infer that Inter–Con would not have incurred the costs involved in preparing a proposal if it did not believe that it could secure a proper license. Moreover, the additional costs that DOS would face in the event that Inter–Con was unsuccessful in securing a license were limited by Section H.7.6 of the solicitation which gave DOS the authority to terminate the contract in the event the Guatemalan government refused to grant any necessary license. In this factual setting, it was reasonable for DOS not to research the licensing issue and instead, in effect, to rely upon Inter–Con's representations along with Inter–Con's experience and expertise in securing the required licenses from host governments throughout the world. Where, as here, DOS's expertise

leads it to develop an approach to contracting that is consistent with its statutory responsibilities and is otherwise reasonable, this court must defer to that approach.

## VI.

Plaintiff argues that even if DOS acted reasonably in awarding Inter–Con the contract at the time it did, DOS now should be obliged to terminate the contract because Inter–Con fraudulently misrepresented in its proposal the status of its licensing efforts. Plaintiff argues that Inter–Con led DOS to believe that Inter–Con was in the process of securing a license in its own name but in reality was attempting to secure a license for its Guatemalan subsidiary. But plaintiff has failed to show any fraudulent or intentional misrepresentation. To the extent the record discloses Inter–Con's intent, it appears that Inter–Con, like DOS, had concluded that through some means Inter–Con would be able to satisfy the licensing requirements set forth in the statute and solicitation. If at some point after submitting its proposal Inter–Con decided to change its approach to securing the required license, such a change does not constitute fraudulent misrepresentation.

## VII.

Plaintiff argues that, in any event, the court should enjoin the contract because, based on the affidavit by the Guatemalan attorney summarized above, Inter–Con never will be successful in securing in its own name the requisite license. But even assuming plaintiff is correct as to the current licensing requirements of Guatemalan law and further assuming that that law is not waived or changed, the inquiry as to whether Inter–Con is "properly licensed" would not end here. Inter–Con gave notice in its proposal that it would create a Guatemalan subsidiary and use the assets of that subsidiary to assist in contract performance. It is possible that if Inter–Con is ultimately unsuccessful in securing a license in its own name it will attempt to secure a license in the name of its foreign subsidiary and then seek to use that license in performing the security guard services under the contract. If this were to

occur, DOS would have to make a determination as to whether Inter–Con should be deemed "properly licensed" when its subsidiary, rather than Inter–Con itself, possesses the required license. Plaintiff argues that the statute and solicitation prohibit Inter–Con from relying upon a license of a subsidiary unless Inter–Con submitted its proposal as a joint venture with that subsidiary. DOS responded during oral argument on the parties' cross–motions that it has not yet formulated a legal opinion on this issue and that it will address the issue only if and when necessary.

It is reasonable for DOS to defer consideration of this issue at this time. For reasons explained above, at this point in time, one can only speculate as to how the licensing issue ultimately will be resolved and, in any event, DOS's interests are protected in that DOS possesses the right to terminate the contract if Inter–Con cannot secure any required license from Guatemala. Hence, if in the future Inter–Con attempts to rely upon a license secured by its subsidiary, DOS at that time can determine whether such a license is adequate or instead whether termination of the contract is warranted. To the extent plaintiff is asking this court to determine at this point in time how DOS should resolve this legal issue should such an issue arise in the future, this request is premature. It is appropriate to wait until DOS considers and addresses this issue in due course before a court considers the legal soundness of DOS's actions. Hence, to date, DOS has reasonably complied with its obligations with respect to licensing under Section 4864.

### VIII.

As an alternative argument to support the grant of an injunction, plaintiff contends that DOS's award of the contract to Inter–Con was improper because the arrangement for performing the contract work described in Inter–Con's proposal, which involves the use of a newly established subsidiary as a branch office, is inconsistent with the bar against subcontracting contained in Section C.2 of

the solicitation.[2] In its proposal, Inter–Con explained the anticipated role of its newly created Guatemalan subsidiary as follows:

> Inter–Con's corporate staff consists of experienced, former high–ranking military, law enforcement, and State Department security personnel, as well as professional managers, accountants, and attorneys. *Through a newly established subsidiary,* Inter–Con Seguridad de Guatemala, S.A., Inter–Con will provide efficient, cost-effective security services while bringing vast experience and expertise to the U.S. Embassy in its provision of Local Guard Program services.

> \*　\*　\*　\*　\*　\*

> Even though Inter–Con's Guatemalan Project Office will be fully equipped to perform the contract with its own resources, it will be totally supported by the substantial experience and resources of the entire Inter–Con organization. Inter–Con realizes that it is the Inter–Con organization which is ultimately responsible for the successful performance of this contract, and as such, is totally committed to ensuring its success.

> \*　\*　\*　\*　\*　\*

> The Inter–Con office in Guatemala City will receive strong support from Inter–Con's corporate staff. These management personnel will be responsible for comprehensive administrative and operational oversight of [Local Guard Program] operations in Guatemala. The major thrust of this support will be on quality assurance and providing guidance, direction and support to ensure complete contract compliance. The full operational, administrative, and financial strength of Inter–Con will be available at all times to ensure the provision of high quality security services to the U.S. Embassy in Guatemala City.

(Emphasis added.)

DOS considered this information and concluded that even though Inter–Con had not formed a joint venture with its subsidiary,

---

**2.** Section C.2.1 provides: "The Contractor shall not subcontract or lease for the standard services, and shall certify in his proposal his understanding that no subcontracts or leases are authorized." Section C.2.2 similarly prohibits the subcontracting of "additional or emergency services."

Inter–Con's use of its wholly owned subsidiary in performing the contract work was consistent with the solicitation's prohibition against subcontracting. The details of DOS's reasoning are contained primarily in the second affidavit filed in support of defendant's cross–motion for summary judgment. Defendant presented the affidavit of William B. Leverett, Assistant Regional Security Officer at the Embassy in Guatemala and Chairman of the TEP that was responsible for evaluating the proposals submitted in response to the instant solicitation. In his affidavit, Leverett initially explained that DOS did not interpret Inter–Con's proposal as involving a prohibited subcontract but rather as calling for Inter–Con to perform the contract with the aid of its new subsidiary. Leverett explained as follows:

> [W]e understood that Inter–Con would be the contractor and the sole entity responsible for the performance of the contract if the contract was awarded to it. We understood, from the proposals, that the Inter–Con Guatemala subsidiary would function as Inter–Con's Guatemala office and not as a separate entity with which Inter–Con would be subcontracting services.

The TEP's understanding as stated above was based in part on the belief that an American company might find it necessary or helpful to form a Guatemalan company in order to perform the local guard services contract in Guatemala. The TEP's understanding was also based upon numerous representations made by and information provided by Inter–Con in its proposals. Throughout its proposals, Inter–Con continuously emphasized that its corporate management team would closely and actively manage and supervise the performance of the services provided by it under the contract and compliance with the terms of the contract. Inter–Con represented that it would supervise training and that its corporate management would engage in inspections and other quality assurance control activities; and that Inter–Con's computer technology and Inter–Con's Standard Operating Procedures

would be utilized to perform the contract. Inter–Con also represented that it would commit its corporate resources to ensure successful performance of the contract, including its key management personnel (including its President & CEO, its VP of International Operations, and its Director of Federal Services). Inter–Con emphasized that its corporate management would make visits to the embassy, be in regular contact with and receive regular reports from the Project Manager, and maintain frequent contact with United States Embassy personnel. Inter–Con also stated that the Project Manager had authority to make binding commitments on behalf of Inter–Con. Furthermore, under Inter–Con's proposal, the Government contracting officer and contracting officer representative would have a direct line of communication to Inter–Con's corporate management. Under these circumstances, we did not perceive that performance of the contract would be subcontracted by Inter–Con in any manner.

■ Gallagher had explained in his affidavit that DOS has interpreted the purpose of the prohibition on subcontracting to be "to ensure that the offeror is fully responsible for contract performance." As quoted above, Leverett further explained in his affidavit that in reviewing Inter–Con's proposal, the TEP understood that Inter–Con, not its subsidiary, would be fully responsible for contract performance. This interpretation and understanding are reasonable. Inter–Con's proposal does not indicate that Inter–Con was entering a formal subcontracting relationship with its newly established subsidiary and nothing in Section 4864 or the solicitation obliges DOS to treat Inter–Con's proposed relationship with its subsidiary as involving a forbidden subcontract. Neither the statute[3] nor the solicitation proposes any definition of subcontracting, much less a definition encompassing those arrangements in which a contractor uses assets of a wholly owned subsid-

---

**3.** 22 U.S.C. § 4864(g) limits subcontracting to 50 percent of the total value of the contract. Neither this subsection nor any other part of the statute defines the circumstances under which arrangements between a parent and its subsidiary should be classified as subcontracting.

iary in performing security guard services under the contract.[4]

To support its contrary position that the solicitation's subcontracting prohibition encompasses parent-subsidiary relationships like that proposed by Inter–Con, plaintiff cites Section K. 12 of the solicitation, which is entitled "STATEMENT OF QUALIFICATIONS FOR PREFERENCE AS A U.S. PERSON FOR PURPOSES OF ... 22 U.S.C. § 4864." Section K. 12 contains a series of numbered questions corresponding to each of the requirements set forth in Section 4864(d) and for certain questions leaves space for the bidder to fill in the answers for submission with its proposal.

Prior to listing the questions, Section K. 12 contains the following note:

> NOTE: Organizations that wish to use the experience or financial resources of another organization or individual, including parent companies, subsidiaries, or local national or offshore organizations, must do so by way of a joint venture. This contract forbids subcontracting. A prospective offeror may be a sole proprietorship, a formal joint venture in which the co-venturers have reduced their arrangement to writing, or a de facto joint venture with no written agreement. To be considered a "qualified joint venture person," the joint venture must have at least one firm or organization that itself meets all the requirements of a U.S. joint venture person listed in Section 136. By signing this proposal, the U.S. person co-venturer agrees to be individually responsible for performance of the contract, notwithstanding the terms of any joint venture agreement.

Plaintiff interprets Section K. 12 as mandating the use of a joint venture structure, such as the one plaintiff uses, if an offeror intends to perform the contract with the assistance of a subsidiary. In his affidavit, however, Gallagher explained DOS's interpretation of Section K. 12 as not requiring an offeror to form a joint venture if it intends to use a subsidiary to assist in performing the contract work, as follows:

> It has been suggested by plaintiff that the Note contained in the Sec. K.12 instructions ... requires offerors to form joint ventures with locally incorporated subsidiaries or affiliates or to disclose the existence of such subsidiaries or affiliates in their Volume 5 Statements of Qualifications, so that the qualifications of the local firm may be considered together with the U.S. person. On the contrary, the Note was added to the standard instructions to notify both prospective offerors and the embassies that only the qualifications of the actual offeror would be considered, and not those of related entities. This was necessary after the General Accounting Office ruled in *Wackenhut International, Inc./Instituto di Vigilanza Citta' di Roma S.r.l./Metronotte*, B–251398.2, 96–1 CPD para. 25 (Jan. 19, 1996) that a new Italian corporation formed in joint venture by a U.S. person and an Italian corporation was not a U.S. person or U.S. joint venture person for Section [4864] preference purposes because of its separate legal entity under Italian law. In reviewing Statements of Qualifications for U.S. person status, I do not look at the relationship of an offeror to its local affiliates or to other firms unless a joint venture is proposed. Then I review the responses to Question 8 [concerning the offeror's joint venture status] to ensure that the U.S. person has certified that it will own 51% of the assets of the joint venture. The same is true of the prohibition on subcontracting ..., the purpose of which is to ensure that the offeror is fully responsible for contract performance.

Hence, according to DOS's interpretation of Section K. 12, the note contained therein was intended, consistent with *Wackenhut International, Inc./Instituto di Vigilanza Citta' di Roma S.r.l./Metronotte*, to warn prospective bidders who could not on their own satisfy the requirements set forth in Section 4864(d) relating to experience and financial

---

4. In a similar bid protest covering the provision of security guard services in Chile, the Comptroller General concluded that Inter–Con's plan to rely upon its newly created subsidiary's licenses in performing the contract did not constitute a prohibited subcontract. *Wackenhut Int'l, Inc.*, B–272014, B–272014.2 (Sept. 9, 1996).

resources that absent a joint venture, they could not rely upon the qualifications of other organizations, including parents or subsidiaries, to satisfy these criteria. Under DOS's interpretation of Section K. 12, Inter–Con had sufficient experience and financial resources on its own to satisfy the requirements set forth in Section 4864(d) for qualifying as a "United States person" and therefore was not required to form a joint venture with its Guatemalan subsidiary.

DOS's interpretation of Section K. 12 as not requiring a bidder to form a joint venture with its wholly owned subsidiary that will assist in contract performance is fully consistent with the wording and placement of the note contained therein. The note precedes the questions that track the requirements in Section 4864(d). Questions 4 and 7 solicit information as to experience and financial resources and it is therefore reasonable to interpret the note as addressing the type of information that a prospective bidder properly should provide in response to those questions.[5] In this setting, the note reasonably can be interpreted as merely a warning to prospective bidders that for purposes of demonstrating compliance with the requirements of Section 4864(d), the bidders cannot rely upon, and should not provide information concerning the experience and financial resource of, any entities other than the bidders themselves. Inter–Con, which has extensive experience in providing security guard services throughout the world, is the entity ultimately responsible for performing the contract. Because Inter–Con satisfied the experience and financial resource requirements of Section 4864(d) on its own without consideration of its Guatemalan subsidiary, it did not need to rely upon the

experience and financial resources of its subsidiary to make it eligible for the "United States person" preference. Hence, the note served its purpose here—it informed Inter–Con that only the experience and financial resources of Inter–Con itself would be considered in awarding the "United States person" preference. Thus, DOS did not act improperly when it interpreted Section K. 12 as not precluding the grant to Inter–Con of the 5–point preference and as not barring Inter–Con's arrangement to use its newly created Guatemalan subsidiary as a branch office to assist in contract performance.

### IX.

As another alternative ground supporting the grant of an injunction, plaintiff contests certain decisions by the TEP in evaluating the respective proposals submitted by Inter–Con and plaintiff. But plaintiff has failed to demonstrate the prejudicial error that would warrant this court setting aside DOS's award of the contract to Inter–Con.

### A.

Federal Acquisition Regulation (FAR) 15.605(b)(1)(ii) provides that "[p]ast performance shall be evaluated in all competitively negotiated acquisitions expected to exceed $100,000." Consistent with this requirement, the solicitation listed "Past Performance and Experience" as one of the factors to be considered in evaluating the competing proposals. The TEP granted Inter–Con the maximum possible points for this category. Plaintiff contends that because the arrangement between Inter–Con and its subsidiary amounted to a de facto subcontract, the TEP also should have evaluated the past perfor-

---

**5.** The relevant questions are as follows:
*Question 4:*
Describe on an attachment ... the qualifying similar contracts or other arrangements performed by the prospective offeror. Provide required information on a sufficient number of arrangements to show that similar services have been preformed overseas or in the United States. The description must consist of the following information on each arrangement, which shall be submitted as an Attachment to this Statement:
 Location: ＿＿＿＿＿＿ (city and state or country)

Type of service: ＿＿＿＿＿＿ (for example, stationary guards, roving patrol, quick-reaction force, etc.)
Complexity: ＿＿＿＿＿＿ (type of facilities guarded, and number or extent of facilities, number of guards, etc.)
*Question 7:*
(Materials demonstrating existing technical and financial resources in the United States must be submitted as an Attachment ... to this Statement).

**104**

mance and experience of the subsidiary as a separate entity and then weighed the respective ratings together in awarding points to the Inter–Con proposal. Because Inter–Con's newly established subsidiary lacked past performance and experience, plaintiff argues, the combined rating of the two entities could not reasonably amount to a perfect score. Plaintiff's argument, however, is based on the mistaken conclusion that the solicitation or statute obliged the TEP to consider the relationship between Inter–Con and its subsidiary as involving a subcontract. For the reasons set forth above, the TEP acted within its discretion when it determined not to classify as a subcontract Inter–Con's relationship with its subsidiary. The proposal lists Inter–Con as the offeror and hence, under FAR 15.608(a)(2), DOS acted properly when it based its evaluation on Inter–Con's past performance and experience.[6] Inter–Con has had extensive experience in providing local security guard services and this court cannot conclude that it constituted an abuse of discretion for the TEP to grant Inter–Con a perfect score for past performance and experience despite its Guatemalan subsidiary's lack of experience.

### B.

The TEP also granted Inter–Con the maximum possible points for the category of "Key Personnel." The solicitation provides that the "Project Manager" and the "Guard Force Commander" constitute "Key Personnel" and the TEP concluded that for Inter–Con's proposal, "[b]oth Program Manager and Guard Force Commander have had experience and knowledge of the local guard program as well as a magnitude of security insight necessary to run a program of this caliber."

Plaintiff disputes the qualifications of both Inter–Con's Project Manager, Thomas A. Cseh, and Guard Force Commander, Oscar Rolando Santizo G. With respect to the

Project Manager, plaintiff argues, inter alia, that Inter–Con's claims regarding Major Cseh's experience were not consistent with Major Cseh's resume that was included in the administrative record and that the resume shows a three-year gap in Major Cseh's employment for which the TEP should have deducted points. Plaintiff notes that in evaluating another offeror's proposal, the TEP criticized such a gap in employment. With respect to Inter–Con's Guard Force Commander, plaintiff argues, *inter alia*, that although Major Santizo's resume shows experience as Chief of Services and Security in the Offices of the Guatemalan President and Vice President, his resume identifies no embassy guard service or related experience whatsoever. In addition, plaintiff criticizes Inter–Con for failing to indicate Major Santizo's capacity to speak English, a factor that the TEP considered in evaluating other offerors' Guard Force Commanders.

In his affidavit, Leverett responded in detail to plaintiff's criticism of the TEP's evaluation of Inter–Con's key personnel. Leverett stated that the TEP reviewed the resumes and other information provided relating to Inter–Con's key personnel and concluded that Inter–Con's team was "superior to the key personnel proposed by the other offerors." Leverett explained that in coming to this conclusion, the TEP, *inter alia*, considered the qualifications of the Project Manager to be more important than those of the Guard Force Commander because the Project Manager plays a more critical role in carrying out the contract. Leverett acknowledged that Major Santizo lacked prior embassy experience but concluded that he nevertheless had the experience necessary to supervise a local security guard unit.

■ In evaluating plaintiff's criticisms of the TEP's assessment of Inter–Con's key personnel, it is crucial for this court to recog-

---

**6.** A focus on the experience of only the offeror is clear, for example, from Section L. 1.3.3(b)(1) of the solicitation, which directs the offeror as follows:

List all contracts and subcontracts *your company* ... has held over the past three years for the same or similar work. Provide the follow-

ing information for each contract and subcontract. However, if *your company* ... has no performance history or relevant experience, the Contractor must provide a list of references where the key personnel and management worked on similar contracts.
(Emphasis added.)

nize the limited scope of review that Congress prescribes for courts reviewing agency procurement decisions. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995 (Fed. Cir.1996) ("This court ... must afford great deference to agencies' decisions in relation to procurement."). In the private sector, firms are generally free to make their own procurement decisions without being subject to court scrutiny. This approach allows firms to make decisions quickly and efficiently without spending extensive resources on documenting the basis for each decision. For a variety of reasons, Congress determined that this private sector model should not control for federal agency procurements and that court review generally should be available. Although Congress opened the door to judicial review, Congress did not intend for the courts to function as an ultimate evaluation panel that would reweigh the competing proposals for each contract and determine which offeror should have prevailed. Rather, Congress anticipated a much more limited role for the courts and granted the courts the authority to reverse a contract award only if the agency's actions are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. Congress apparently concluded that a more interventionist role for the courts would unduly complicate the contracting process. *See Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir. 1993) ("Effective contracting demands broad discretion."); *Tidewater Management Services, Inc. v. United States,* 216 Ct.Cl. 69, 83, 573 F.2d 65, 73 (1978) (quoting *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977)) ("Effective contracting demands broad discretion, for 'the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for.' ").

Plaintiff argues that Inter–Con's proposal exhibited some of the same weaknesses that the TEP raised in its critical comments about other offerors' proposals and consequently

Inter–Con should not have received a perfect score. It is not clear from the record, however, that the TEP deducted points for these specific criticisms of the other offerors. Moreover, in effect, in the TEP's view, the positive aspects of Inter–Con's proposal apparently compensated for any equivalent deficiencies. The administrative record as amplified by Leverett's affidavit indicates that the TEP engaged in a reasonably thorough analysis and based on a review of the record as a whole, the court cannot conclude that the TEP erred in its conclusion that Inter–Con's key personnel were "superior" and deserved the maximum available points for that category. In this regard, the TEP's grant of greater weight to the Project Manager's qualifications than to those of the Guard Force Commander was not inconsistent with the solicitation requirements and appears reasonable.

Plaintiff contends that the Leverett affidavit constitutes merely a post hoc rationalization of a prior decision. But the Leverett affidavit did not set forth new alternative grounds for the TEP's decision but rather merely explained the reasoning process the TEP actually employed in evaluating Inter–Con's proposal, including the meaning of certain statements the TEP made in the administrative record. It is well established that when evaluating the correctness of a government action a court may consider such affidavits which fill in gaps in the administrative record concerning the actual basis for a decision. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("If ... there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was ... to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."); *Montgomery Ward & Co., Inc. v. Zenith Radio Corp.,* 69 C.C.P.A. 96, 673 F.2d 1254, 1257 n. 4, *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982) ("It is only with the administrative record before the court, supplemented if necessary by the affidavits from appropriate officials, that a decision can be made....").[7]

---

7. Plaintiff also criticizes DOS's evaluation of

plaintiff's own key personnel. The TEP awarded

## X.

Summary judgment is warranted where there is no dispute as to any material issue of fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact and can rely upon affidavits to satisfy this requirement. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. If the moving party satisfies its burden, the burden shifts to the nonmoving party to demonstrate the presence of a genuine issue of fact. RCFC 56(f). If the nonmoving party requires discovery to respond to a properly supported motion, it may seek such discovery from the court. RCFC 56(g).

Herein, pursuant to a procedure adopted by the court prior to plaintiff filing its motion for summary judgment, defendant provided plaintiff with copies of the affidavits upon which defendant intended to rely in its cross-motion for summary judgment. Plaintiff chose not to request discovery to dispute the factual allegations made in these affidavits either prior to filing its motion for summary judgment or prior to filing its opposition to defendant's cross-motion. Instead, plaintiff chose to criticize the affidavits as improper post-decision rationalizations for the TEP's

actions and as otherwise inadequate to support the award of the contract to Inter–Con. For the reasons set forth above, the court disagrees. Defendant's cross-motion for summary judgment is sufficient to establish certain facts which, if not disputed by plaintiff, can support summary judgment as a matter of law. In its response to defendant's cross-motion, plaintiff has not successfully disputed these facts and hence, defendant is entitled to summary judgment.

### Conclusion

For the reasons set forth above, plaintiff's motions for a temporary restraining order, a preliminary injunction, a permanent injunction, and summary judgment are each denied. Defendant's and defendant-intervenor's cross-motions for summary judgment are granted. The Clerk of the Court shall enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

plaintiff 8 out of 9 possible points for this category. Plaintiff alleges that although DOS now takes the position that English fluency was not a requirement for the Guard Force Commander, DOS downgraded plaintiff's Key Personnel rating because Leverett disputed plaintiff's representation that its Guard Force Commander had a level 3 fluency in English. But even assuming the TEP's deduction of one point in plaintiff's Key Personnel rating was an abuse of discretion,

this would not constitute the prejudice necessary to support an injunction because a one-point increase in plaintiff's evaluation would still leave plaintiff's total score over three points below Inter–Con's overall score. *See Data General,* 78 F.3d at 1562 ("To establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").